**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

JANECE GRAPP, individually, as Administrator of the Estate of KINSEY JEAN HICKS, and as Next Friend of H.L.L. and M.L.L., minors, and RODNEY HICKS, individually,

Plaintiffs,

v.

INARI MEDICAL, INC.,

Defendant.

**Case No. __________________**

**ORIGINAL COMPLAINT AND JURY DEMAND**

Janece Grapp, in the capacities stated below, and Rodney Hicks, individually, bring this action against Inari Medical, Inc.

**PARTIES**

1. Janece Grapp is Kinsey Jean Hicks's mother and is domiciled in Polk City, Iowa. She sues individually for the loss of her daughter and as Administrator of the Estate of Kinsey Jean Hicks. On October 15, 2026, the Iowa District Court for Scott County appointed Grapp as Administrator in Probate No. ESPR084735, and the clerk issued Letters of Appointment that day. In that capacity, she brings the Estate's claims under Iowa Code sections 611.20 and 611.22 and Federal Rule of Civil Procedure 17(a)(1)(B).

2. Rodney Hicks is Kinsey's father. He sues individually for the loss of his daughter under Iowa Code section 613.15A. He is domiciled in Iowa.

3. At her death on December 2, 2024, Kinsey was domiciled in Bettendorf, Scott County, Iowa. She left no surviving spouse. Her children, H.L.L. and M.L.L., are minors domiciled in

Iowa. Grapp, their maternal grandmother, appears as next friend of H.L.L. and M.L.L. In her capacity as Administrator, she brings each child's claim for loss of parental consortium under Iowa Code section 613.15. The probate petition identifies Jason and Catherine Loyd as temporary guardians. If the children require separate representation, Grapp requests an appropriate order under Federal Rule of Civil Procedure 17(c).

4. Defendant Inari Medical, Inc. ("Inari") is a Delaware corporation with its headquarters and principal place of business at 6001 Oak Canyon, Suite 100, Irvine, California 92618. Inari designed, manufactured, marketed, and distributed ClotTriever thrombectomy devices for use by physicians treating patients with deep-vein thrombosis. Inari may be served through its Delaware registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1). The amount in controversy on the Administrator's claim exceeds $75,000, exclusive of interest and costs. Grapp is an Iowa citizen individually and, as Administrator, has Kinsey's Iowa citizenship. Rodney Hicks and both children are citizens of Iowa. Inari is a citizen of Delaware and California. 28 U.S.C. § 1332(c)(1)–(2). The individual consortium claims arise from the same procedure and death and fall within the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) to the extent necessary.

6. Inari marketed and supplied ClotTriever products to Iowa hospitals for use by Iowa physicians. Upon information and belief, Inari supplied the system used at Trinity Bettendorf through those sales and distribution channels targeting the state of Iowa. Kinsey was injured during the very use for which Inari supplied the system in Iowa. The Court has specific personal jurisdiction over Inari.

7. Venue is proper under 28 U.S.C. § 1391(b)(2). Kinsey's procedure, injury, and death occurred in Scott County, within the Eastern Division of the Southern District of Iowa.

## NATURE OF THE ACTION

8. Kinsey Jean Hicks was twenty-five years old and the mother of two young children. On December 2, 2024, she underwent a procedure at UnityPoint Health–Trinity Bettendorf to remove blood clots from the deep veins of her right leg. The vascular surgeon used an Inari Medical thrombectomy system. Kinsey lost her pulse near the end of the procedure and died that evening.

9. Kinsey already had blood clots in her lungs when she entered the hospital. The Estate alleges that the Inari system released additional clot into her circulation during the procedure, that the clot traveled to her lungs, and that the additional obstruction caused her fatal collapse. The Estate seeks recovery for defects in how the system captured clot and in the instructions Inari gave physicians for its use.

## THE INARI DEVICE

10. Dr. Afzal H. Abdullah identified the device in his operative report as a "13 French Inari clot Treiber device." He separately described placing the 13-French sheath supplied with the system. In this Complaint, the "system" means the Inari thrombectomy catheter, sheath, and associated clot-removal components actually used in Kinsey's procedure.

11. The hospital records identify the manufacturer, the type of procedure, and the recorded size designation. The cath-lab charge sheet lists the procedure and leaves the part-number field blank. The precise catheter variant, component combination, catalog number, and lot remain unknown.

12. Inari designed the ClotTriever family to remove thrombus from peripheral veins. Inari describes a catheter that separates clot from the vessel wall and collects it for withdrawal through a sheath. Upon information and belief, the system supplied for Kinsey's treatment used that

method and reached the treating team without a material change to the design or instructions at issue here.

**KINSEY'S TREATMENT AND DEATH**

13. Kinsey gave birth to her younger child in August 2024. On November 29, she presented to Trinity Bettendorf with pain and swelling in her right leg. A chest CT angiogram showed extensive bilateral pulmonary emboli obstructing segmental branches. It showed no saddle embolus or ventricular strain. The emergency department started intravenous heparin.

14. A November 30 duplex study showed extensive occlusive thrombosis in the right leg, extending from the external iliac vein into the femoral, popliteal, and peroneal veins. Echocardiography showed normal right-ventricular size and function. Kinsey was hemodynamically stable and breathing room air.

15. Cardiology recommended continued anticoagulation. Kinsey continued to experience substantial leg pain and swelling despite more than twenty-four hours of heparin. Dr. Abdullah discussed continued anticoagulation and thrombectomy with her. He documented discussing bleeding, pulmonary embolism, and fatal complications. Kinsey elected thrombectomy for the clot in her leg.

16. On December 2, Dr. Abdullah obtained venous access behind Kinsey's right knee while she was prone under conscious sedation. Venography showed extensive, nearly occlusive clot in the right leg and a patent inferior vena cava without visible thrombus. He placed the Inari sheath and advanced the thrombectomy catheter.

17. Dr. Abdullah described positioning a "filter basket" in the inferior vena cava. He made three runs through the iliac and femoral veins in different orientations. Venography still showed

clot in the mid and distal femoral vein. He made a further pass and removed more clot. He documented restored flow through the treated veins.

18. Kinsey experienced discomfort and received additional sedation. The cath-lab monitor recorded fluctuating oxygen saturation during the procedure. At 5:02 p.m. the medication record documents intravenous fentanyl and midazolam. The monitor recorded oxygen saturation of 84% at 5:03 p.m., 63% at 5:08 p.m., and 58% at 5:13 p.m., followed by a reading of 99% at 5:22 p.m.

19. Near the end of the procedure, the surgeon observed that Kinsey’s oxygen saturation improved when she was aroused. After the sheath was removed and the dressing applied, she was breathing poorly and had become cyanotic. The nurse documented snoring, brief arousal followed by somnolence, supplemental oxygen, and attempts to open Kinsey’s airway. Reversal agents produced no observed improvement.

20. Kinsey was turned onto her back. The team could not palpate a pulse and began CPR at approximately 5:29 p.m. Her predominant arrest rhythm was pulseless electrical activity. Dr. Abdullah identified worsening pulmonary embolism as the most likely cause and administered two 50-milligram doses of tissue plasminogen activator, a clot-dissolving drug.

21. During resuscitation, Dr. Abdullah described moderate right-ventricular dilation after the first dose. A limited echocardiogram showed severe left-ventricular dysfunction. The team also transfused blood after Kinsey’s hemoglobin fell. Despite resuscitation, she died at 7:21 p.m.

22. The death certificate, certified December 6, 2024, records cardiopulmonary arrest due to extensive deep-vein thrombosis and classifies the manner of death as natural. It lists hypercoagulability, pulmonary embolism, and her postpartum state as other significant conditions.

23. The final autopsy report attributes death to cardiopulmonary arrest following treatment for pulmonary thromboemboli and deep-vein thromboses. The pathologist found retroperitoneal

hemorrhage. He found no pulmonary emboli at autopsy and explained that the thrombolytic medication likely accounted for their absence. He could not determine the specific mechanism of arrest.

24. Based on Kinsey's condition before thrombectomy, the repeated removal of clot from her leg, the deterioration during the procedure, and the treating surgeon's assessment, the Administrator alleges on information and belief that clot dislodged during use of the system escaped collection, traveled through the vena cava to the pulmonary arteries, and aggravated her existing embolic obstruction. The Administrator alleges that this additional embolization caused the fatal collapse, either alone or together with respiratory depression or airway compromise.

## INARI'S KNOWLEDGE OF THE EMBOLIZATION RISK

25. Before Kinsey's procedure, Inari received reports of other patients who deteriorated during peripheral venous thrombectomy. The following reports identify devices used in those patients and describe what Inari learned about clot escaping during treatment.

26. In 2020, Inari reported that a patient with a preexisting pulmonary embolus deteriorated after three ClotTriever passes and later died. Inari's chief medical officer concluded that the catheter may have contributed to embolization of the leg clot and recurrent pulmonary embolism. FDA Medical Device Report 3011525976-2020-00006 (MDR Key 9936087).

27. In 2023, Inari reported a fatal event involving a Model 40-102 catheter. The patient developed hypoxia and lost consciousness following repeated passes. Inari's medical reviewer attributed the death to distal embolization. In another 2023 case involving a BOLD catheter, no clot was seen initially in the inferior vena cava. After three passes, clot was seen in the iliac vein and vena cava. After a further pass, the patient developed hypoxia, pulmonary embolism, and right-heart failure and later died. MDR Keys 16421595 and 17269174.

28. On July 19, 2024, Inari sent customers a labeling correction for its ClotTriever XL catheter. It warned that a thrombectomy catheter can release clot into the circulation and instructed operators how to withdraw the XL catheter and remove excessive clot in stages. FDA classified the correction as a Class I recall, No. Z-2587-2024. The correction concerned the XL model. Its significance here is Inari's knowledge of clot escape and its ability to communicate precautions for any mechanism the XL and Kinsey's device shared.

29. Inari received notice of another ClotTriever event on November 27, 2024. A patient undergoing leg thrombectomy deteriorated during deployment and required resuscitation. Imaging revealed clot in a pulmonary artery. In a report dated December 20, after Kinsey's death, Inari's chief medical officer attributed that patient's deterioration to inadvertent clot embolism. MDR Key 20995316.

30. Inari stated in several reports that distal embolization and cardiovascular collapse appeared in its labeling as potential complications. In a May 2023 case involving falling oxygen saturation during thrombectomy and additional sedation, its chief medical officer attributed the deterioration to clot embolism, sedation, or both (MDR Key 17139927). Inari reported finding no device malfunction or quality issue in several investigations. The danger at issue here is the release of clot during ordinary operation, even when the catheter retrieves clot and blood flow through the treated leg improves.

**COUNT I. DESIGN DEFECT**

31. The Administrator incorporates paragraphs 1 through 30.

32. At the time of sale or distribution, Inari's system was defective in the design of the components that engage, collect, and withdraw clot. Upon information and belief, when the catheter moved through a substantial burden of venous clot or drew the collected material back

into the sheath, it could free clot before it was contained or allow clot to escape as the collection element collapsed. Blood flowing toward the heart could carry the escaped material to the lungs.

33. Upon information and belief, a reasonable alternative design available at the time of sale would have maintained suction at the point where the catheter engages the clot and draws it into the sheath, capturing loose material throughout that movement. Inari's pre-incident system descriptions already included an aspiration port for removing material from the sheath. The proposed change concerns where and when suction captures material during clot removal.

34. The Administrator alleges that this design could have been adopted at reasonable cost while preserving the system's ability to remove venous clot. It would have reduced the foreseeable risk of pulmonary embolization. Given the severity of that risk, the omission rendered the system not reasonably safe for its intended use.

35. The system was used to remove extensive clot from Kinsey's peripheral veins, its intended purpose. The Administrator alleges that the design permitted clot to escape during that use and that the alternative design would have captured enough of the escaping clot to prevent the fatal worsening of her pulmonary obstruction. The design defect was a cause of her injury and death.

**COUNT II. INADEQUATE WARNINGS AND INSTRUCTIONS AT SALE**

36. The Administrator incorporates paragraphs 1 through 30.

37. At the time of sale or distribution, Inari knew or should have known that, in a patient with an extensive clot burden, the catheter could mobilize more clot than it retained. Inari owed the physicians selecting and using the system a duty to give reasonable warnings and instructions about this danger and the precautions available to reduce it.

38. Upon information and belief, the instructions Inari provided inadequately explained how clot could escape during a pass or during withdrawal into the sheath, how to recognize when the

clot burden exceeded the system's collection capacity, when to limit the amount engaged on each pass or retrieve it in stages, and when falling oxygen saturation warranted pausing further passes to assess possible embolization.

39. Before the procedure, Dr. Abdullah weighed continued anticoagulation against intervention for persistent leg symptoms. During the procedure, he had to decide whether to make another pass for residual femoral clot. A warning of pulmonary embolism as a general procedural risk did not tell him how this system could add clot to an already compromised pulmonary circulation or how to reduce that risk.

40. Upon information and belief, a timely and adequate instruction would have reached Dr. Abdullah. Had he received it, he would have continued anticoagulation or limited the amount of clot engaged and withdrawn at a time. The Administrator alleges that these precautions would have avoided the additional embolization that caused Kinsey's death. The omission of adequate instructions rendered the system not reasonably safe and was a cause of her injury and death.

**COUNT III. NEGLIGENT FAILURE TO WARN AFTER SALE**

41. The Administrator incorporates paragraphs 1 through 30. She pleads this count in the alternative to Count II to the extent Inari acquired material information after distributing the components used in Kinsey's treatment and before December 2, 2024.

42. As it received and investigated reports of pulmonary embolization during thrombectomy, Inari knew or reasonably should have known its system posed a substantial risk of serious injury. Upon information and belief, its sales and account records identified Trinity Bettendorf as a user. The hospital and its vascular physicians could reasonably be expected to lack the information Inari had assembled about when clot escaped and how to prevent it.

43. Inari could have reached the hospital's cath lab and the physicians selecting the system through a directed safety notice explaining the risk and recommending precautions for the devices supplied. They could have acted on that information before treatment. The risk of fatal pulmonary embolism justified the burden of sending that notice.

44. Upon information and belief, Inari failed to give an adequate post-sale warning to those users. Had Dr. Abdullah received it before Kinsey's procedure, he would have selected continued anticoagulation or altered the amount of clot engaged and withdrawn per pass, avoiding the fatal embolization. Inari's failure to exercise reasonable care was a cause of Kinsey's injury and death.

**COUNT IV. LOSS OF PARENTAL CONSORTIUM — H.L.L. AND M.L.L.**

45. The Administrator incorporates paragraphs 1 through 44. Kinsey cared for both children. H.L.L. lost the care and guidance Kinsey had provided throughout H.L.L.'s childhood. M.L.L., born in August 2024, was still an infant when Kinsey died. Both children lost the affection, companionship, protection, and guidance their mother would have provided as they grew up.

46. Kinsey had worked in food service and intended to return to work after M.L.L.'s birth. Her death deprived each child of parental services and of the financial support Kinsey would have provided. Under Iowa Code section 613.15, the Administrator seeks recovery for H.L.L.'s loss and for M.L.L.'s loss, measured separately for each child.

**COUNT V. LOSS OF AN ADULT DAUGHTER'S CONSORTIUM**

47. Janece Grapp and Rodney Hicks, each in an individual capacity, incorporate paragraphs 1 through 44. They seek recovery under Iowa Code section 613.15A for their respective losses resulting from the death of their adult daughter.

48. Janece visited Kinsey and her family every few weeks. Kinsey's death deprived Janece of her daughter's company on those visits and of the services, companionship, and society Kinsey would have provided her.

49. Kinsey and her older child lived with Rodney for nearly a year in 2022. Kinsey's death deprived Rodney of his daughter's companionship and society and of the services she would have provided him. Each parent seeks compensation for that parent's own actual loss.

## DAMAGES

50. The Administrator seeks the reasonable and necessary medical and hospital expenses attributable to the fatal injury, compensation for the conscious physical and mental suffering Kinsey experienced from that injury before death, the present value of the net accumulations her estate lost through her premature death, and interest on reasonable funeral and cremation expenses for the period they were prematurely incurred, subject to the limits of Iowa law.

51. The Administrator seeks punitive damages under Iowa Code section 668A.1. Inari's medical reviewers linked clot escape to deaths despite existing warnings. Inari issued specific removal precautions for the XL catheter. The Administrator alleges on information and belief that, despite repeated reports and its knowledge of the common risk, Inari consciously withheld adequate precautions applicable to the system supplied to Kinsey's hospital, in willful and wanton disregard for patient safety.

## PRAYER FOR RELIEF

Plaintiffs request judgment against Inari Medical, Inc. The Administrator seeks compensatory damages for Kinsey's injuries and the Estate's losses, recovery for the separate losses of H.L.L. and M.L.L. under section 613.15, and punitive damages as permitted by Iowa law. Janece Grapp and Rodney Hicks each seek damages for the loss of their daughter's services,

companionship, and society under section 613.15A. Plaintiffs request separate findings on each loss, with no duplicate recovery, and apportionment by the Court as required by section 633.336, including the statutory priority of the children's recovery over the parents' recovery. Plaintiffs also request prejudgment and postjudgment interest, taxable costs, and all other relief the Court deems just.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues triable by jury.

Respectfully submitted,

By /s/ Brian O. Marty
Brian O. Marty, AT0011622
J. Barton Goplerud, AT0002983
SHINDLER ANDERSON GOPLERUD
& WEESE P.C.
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265-5749
Telephone (515) 223-4567
Facsimile (515) 223-8887
marty@sagwlaw.com
goplerud@sagwlaw.com
Local Counsel

Jeffrey T. Embry
Texas Bar No. 24002052
HOSSLEY & EMBRY, LLP
515 S. Vine Avenue
Tyler, Texas 75702
Telephone (903) 526-1772
Facsimile (903) 526-1773
jeff@hossleyembry.com
Pro hac vice admission to be sought
Lead Counsel

**ATTORNEYS FOR PLAINTIFFS**